UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ARNETTE RODGERS, CARMEN KNIGHT, TAMIE
RICE, KATRINA TATE-ANDERSON, JAUNICE
FLOWERS, CHERYL SHARPLEY, ANTHONY
COOPER, SARAH JENKINS, WENDELL FINLEY,
ARECIA STEVENS, CRYSTAL ALLEN-CRUCE,
YOLANDA JOHNSON, KEITH CARTER, LAURA
HILL, YVONNE MALVAUX, ALVITA MOSS, and
DORNITA CLEVELAND,

Case No.10-11799
Honorable Julian Abele Cook, Jr.

                    Plaintiffs,
v.

36TH JUDICIAL DISTRICT COURT and CHIEF
JUDGE MARILYN E. ATKINS,

                    Defendants.

ORDER

        This lawsuit arises out of allegations by the Plaintiffs who complain that the Defendants,

the 36th Judicial District Court ("36th District") and its Chief Judge Marilyn E. Atkins, violated 42

U.S.C. § 1983 by terminating their employment without affording them with due process as

guaranteed by the 5th and 14th Amendments to the United States Constitution.

        Pursuant to a directive from the Court, the parties have now filed cross-motions for a

summary judgment, with each side proclaiming that there are no genuine issues of a material fact

to be resolved.  Thus, it their collective belief that the issues in controversy herein can be resolved

as a matter of law by the Court.

I.

        All seventeen of the Plaintiffs are former 36th District employees who worked in various

1

capacities for the court.  During all of the times that are relevant to this controversy, each Plaintiff was a member of a labor union (to wit, the American Federation of State, County, and Municipal Employees, Council 25, and its affiliated Local 3308) ("the Union"), which represents the 36th District clerical employees.  The Plaintiffs became employees of the 36th District pursuant to a collective bargaining agreement ("CBA") with the Union.  As the result of subsequent state court litigation, the parties appear to have finally agreed that the CBA between the Union and the 36th District Court remained in full force from June 30, 2006 until June 30, 2009.

The CBA contains several provisions that are relevant to this dispute, including (1) language in Article 12, Section 1 which provides that "[d]isciplinary action shall be imposed only for just cause," and (2) an extensive descriptive process in Article 8 for the handling of grievance and arbitration procedures regarding employee claims. (Def's. Mot. for Summ. Jdgmt., Exh. 1 – CBA). In particular, the first four steps of the grievance process provide for a series of increasingly involved discussions, meetings and/or written correspondence between the employee, his/her union representatives, and representatives of management and/or the 36th District Court.  It is only after a grievance remains unresolved after Step 5 that it can be submitted to arbitration. In addition, Article 50 of the CBA contained the following relevant clause:

> This Agreement shall remain in full force and effect until June 30, 2006
> This Agreement shall continue in effect for consecutive yearly periods after June 30, 2006, unless notice is given, in writing, by either of the Union or the Employer, to the other party at least ninety (90) days prior to June 30, 2006, or any anniversary date thereafter, of its desire to modify, amend or terminate this Agreement. If such notice is given, this Agreement shall be open to modification, amendment or termination, as such notice may indicate on June 30, 2006, or the subsequent anniversary date, as the case may be.

(Def's. Mot. for Summ. Jdgmt., Exh. 1 – CBA, Article 50).

2

The Defendants assert that the 36th District sent a notice to Beverly A. Harris, President of the Union, on March 1, 2006, advising her that the CBA would terminate on its stated expiration date. (Def's. Mot. for Summ. Jdgmt., Exh. 2). They also point out that Harris wrote to them on August 10, 2006, and she expressed her awareness that the CBA had expired on June 30, 2006.

According to the Plaintiffs, all - with the exception of two of them - were terminated between June 30, 2006 and June 30, 2009, for a variety of reasons.[1] However, the Defendants maintain that (1) eight of the Plaintiffs were fired for improperly dismissing traffic tickets, (2) three of them were discharged after failing to return from health-related leaves of absences, and (3) the remaining six Plaintiffs were fired for other misconduct or acts of impropriety which ranged from poor attendance and work performance to abusive conduct and the filing of false claims for bereavement benefits.[2]

The Plaintiffs claim that, with two exceptions, each of them filed grievances regarding their termination along with demands for arbitration as authorized by the CBA.[3] Yet, according to the Plaintiffs, the Defendants refused to arbitrate their claims. The Defendants disagree.

II.

---

[1] The Plaintiffs assert that Johnson and Malvaux were terminated on August 7, 2009 and September 15, 2009, respectively.

[2] According to the Defendants, (1) Rodgers, Knight, Rice, Tate-Anderson, Sharpley, Cooper, Jenkins, and Carter were relieved of their employment duties for improperly disposing of traffic tickets; (2) Flowers, Cleveland, and Stevens were terminated for failing to return to work following their approved leaves of absences; and (3) the remaining Plaintiffs, Finley, Allen-Cruce, Johnson, Smith/Hill, Malvaux and Moss were fired for other misconduct.

[3] The Plaintiffs argue that the Defendants denied their quest for arbitration in anticipation of Malvaux's demand, which rendered their application for similar relief futile. As for Cleveland, they claim that her access to the entire grievance procedure was denied based on its conclusion that the CBA had been terminated.

In 1986, the Supreme Court opined that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  Under Federal Rule of Civil Procedure 56(c), a motion for a summary judgment should be granted if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."  Here, the burden is upon the movants to demonstrate the absence of a genuine issue of a material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In assessing a motion for summary judgment, a court should examine any pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the nonmoving party.  Fed. R. Civ. P. 56(c); *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir. 1991). It is the responsibility of a court to determine "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.  Hence, a summary judgment must be entered only if (1) the evidence clearly suggests that the contested matter is "so one-sided that [the proponent] must prevail as a matter of law," *id.* at 252, or (2) the opponent fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  More importantly, the presentation of a mere scintilla of supporting evidence is grossly insufficient. *See Anderson*, 477 U.S. at 252, *quoted in Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).

III.

4

In their motion for summary judgment, the Defendants initially argue that they are entitled to absolute immunity from this lawsuit under the Eleventh Amendment, which provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The Supreme Court has long recognized that the Eleventh Amendment also grants immunity to a state from federal lawsuits which have been initiated by its own citizens. *See Hans v. Louisiana*, 134 U.S. 1, 15 (1890). This immunity also extends to any entity that is an "arm of the state" and applies to those "actions against state officials [who are] sued in their official capacity for money damages." *Barachkov v. 41B District Court,* 311 Fed. Appx. 863, 867 (6th Cir. 2009) (unpublished) (lawsuit against state official in his/her official capacity is an action against official's office); *See also, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).

The principal dispute between the parties centers on whether the 36th District Court is properly viewed by the Sixth Circuit as an arm of the state. The Defendants, relying in part on the analysis in *Dolan v. City of Ann Arbor*, 666 F. Supp. 2d 754 (E.D. Mich. 2009), argue that "there can be no question" that the 36th District Court is entitled to sovereign immunity and the complaint should be dismissed with prejudice. To determine - for sovereign immunity purposes - whether an entity is an arm of the state rather than a separate political subdivision, this Court is urged to consider the following four factors:

> "(1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government."

*Pucci v. Nineteenth Dist. Court*, 628 F.3d 752, 760 (6th Cir. 2010) (quoting *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (*en banc*)).  While the first factor is generally the most important one for courts to consider, it cannot be the sole basis for resolving the sovereign immunity analysis.  *Id.*

As many courts have noted, the Michigan Constitution vests the state's judicial power "exclusively in one court of justice," grants the Michigan Supreme Court "general superintending control over all courts," and authorizes the legislature to establish other courts of limited jurisdiction.  *Id.* at 762; Mich. Const. Art. VI, § 1.  Moreover, the Michigan legislature establishes and defines the authority of the state's district courts, while the Supreme Court exercises supervisory and administrative control over those courts.  Based on these principles and the fact that Michigan asserts "considerable state control over judicial officers' appointments" to the district court,  the *Pucci* panel concluded that the second and third *Ernst* factors weighed in favor of finding sovereign immunity.

Finally, as to the fourth factor, the *Pucci* court opined that "if the agency in question carries out a long-recognized state function, it is a particular affront to a state to subject this agency to suit."  *Id.* at 764.  It also noted that the need to respect a state's dignity in assessing Eleventh Amendment immunity is particularly important "in the context of a court system that . . . is mandated by the state constitution to be uniform and to be supervised by one supreme court."  *Id.*  Thus, inasmuch as the Michigan Constitution vests judicial power in "one court of justice," headed by the Supreme Court, the *Pucci* panel concluded that the last *Ernst* factor should also be weighed in favor of granting sovereign immunity to the district court.  These remaining three factors, the court reasoned, outweighed the importance of local funding units' potential liability (which goes to the first *Ernst* factor).  Therefore, the Court ultimately concluded that "The [district court] (as

6

with the Michigan trial level district courts generally) is entitled to the immunity protections of the Eleventh Amendment, and all federal claims against it must be dismissed." *Id.*

Based on *Pucci*, the Court is compelled to agree with the Defendants that the 36th District Court is entitled to the protections of sovereign immunity. Most of the opposing arguments raised by the Plaintiffs were rejected by the *Pucci* court.[4] Furthermore, it is telling that their original pleading relied on the district court analysis in *Pucci* that was ultimately reversed by the Sixth Circuit. Moreover and in light of *Pucci's* unequivocal holding, the Court is not persuaded by the Plaintiffs' efforts to show here that the City of Detroit is liable for any judgments issued against 36th District. Other courts in this District and the Sixth Circuit have reached similar conclusions in the aftermath of *Pucci. See e.g., Dolan v. City of Ann Arbor,* 407 F. App'x. 45, *46 (6th Cir. Jan. 12, 2011) (affirming district court's finding that, as an arm of the state, the district court in the City of Ann Arbor was protected by sovereign immunity from the plaintiff's lawsuit alleging violations of the Family Medical Leave Act); *Englar v. Davis,* No. 04-73977, 04-73957, 2011 WL 1429202 (E.D. Mich. April 14, 2011) (accepting stipulation from parties, in light of *Pucci*, that the district court and its chief judge were entitled to immunity under the Eleventh Amendment based on the action brought against her in official capacity); *Peay v. Page*, No. 11-12234, 2011 WL 2518892 (E.D. Mich. June 23, 2011) (Michigan courts, operating as arms of the state, are entitled to sovereign immunity).

In light of *Pucci*, which was issued after the original pleadings in this litigation had been submitted, the Court invited the parties to file supplemental briefs that would address the impact

---

[4]This includes the argument that by statute, the State of Michigan has indicated that it will not be liable for employment matters arising out of the district courts. Mich. Comp. Laws. § 600.8217(17).

of the decision on the proceedings here.[5] In their supplemental pleading, the Plaintiffs raise a challenge to the wisdom of *Pucci*. Nevertheless, they acknowledge that it is a reasonable interpretation of the case to conclude that the Sixth Circuit has granted blanket immunity to the Michigan district courts. And, in the absence of an *en banc* decision of the Sixth Circuit that overrules *Pucci* or a Supreme Court decision which runs contrary to its current holding, the Court is inclined to agree. Because, the 36th District Court is entitled to Eleventh Amendment sovereign immunity under the controlling precedent in *Pucci*, its request for the entry of a summary judgment must, therefore, be granted. Additionally, any claims for damages which were raised against Chief Judge Atkins in her official capacity as the chief judge must be dismissed based on sovereign immunity. *Pucci, supra* at 764 (as an officer of the 19th District Court, the chief judge is entitled to sovereign immunity from all federal claims which seek damages against him in his official capacity.).

IV.

Next, the Defendants also maintain that the doctrine of qualified immunity should apply to those § 1983 claims which have been brought against Chief Judge Atkins in her individual capacity. Qualified immunity is a protection that "extends to government officials performing discretionary functions," *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999), and it guards them "from undue interference with their duties and from potentially disabling threats of liability. *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). Thus, those government officials, who act in their official

---

[5]The Court will reject the request by the Plaintiffs to strike the Defendants' supplemental reply brief, since the Court expressly granted the Defendants permission to submit such a pleading for the Court's consideration. The Defendants' apparent disregard for the five-page limit for such pleadings, while regrettable, does not warrant a rejection of the entire document under the circumstances.

8

capacities, are immune from personal civil liability as long as their actions "do not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818; *see also Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court announced a two-step sequence for resolving government officials' qualified immunity claims. First, a court must decide whether the facts that a plaintiff has proffered make out a violation of a constitutional right. *Id.* The purpose of this prong is to "ensure that defendants 'reasonably can anticipate when their conduct may give rise to liability'. . . ." *Williams v. Payne,* 73 F. Supp. 2d 785 (E.D. Mich. 1999) *(*citing *United States v. Lanier*, 520 U.S. 259, 270 (1997)). Second, if the plaintiff has satisfied this first step, the court must decide whether the constitutional right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Id.; But see, Pearson v. Callahan,* 555 U.S. 223, 236 (2009) (noting that *Saucier*'s two-step procedure for evaluating qualified immunity claims is no longer mandatory, and leaving it to the discretion of the court to decide which of the two prongs to address first).

## A.

The first prong of the qualified immunity analysis under *Saucier* asks whether the plaintiff's allegations, if true, establish the existence of a constitutional violation. Here, the Plaintiffs complain of a violation of their due process rights under the Fourteenth Amendment. In order to evaluate the legitimacy of this claim, the Court must determine (1) whether the Plaintiffs had a property interest that entitled them to due process protection, and (2) if so, what process was due. *Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir. 2006).

*(1) Have the Plaintiffs Established a Property Interest in their Employment?*

The Supreme Court has noted that "property interests" may take many forms, including the receipt of statutorily prescribed welfare benefits, holding tenured public employment and even implied promises of continued public employment. *See generally, Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972). Yet, in assessing the contours of constitutionally protected property rights, courts cannot turn to the Constitution itself. Rather, the source of property rights must be found elsewhere, as "[p]roperty interests . . . are not created by the Constitution. . . . [T]hey are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id*. at 577; *see also Golden v. City of Columbus*, 404 F.3d 950, 955 (6th Cir. 2005). For the Plaintiffs in this case to have a constitutionally recognized property interest in their continued employment, they "must have more than an abstract need or desire for it[,] . . . more than a unilateral expectation of it. [They] must, instead, have a legitimate claim of entitlement to it." *Roth* at 577. As the Sixth Circuit has noted, the Supreme Court has identified two bases for such legitimate claims of entitlement: "state statutes and contracts, express or implied, between the complaining citizen and the state or one of its agencies." *Golden* at 955.

Here, those Plaintiffs who were terminated prior to the expiration of the CBA[6] - citing *Farhat v. Jopke,* 370 F.3d 580, 595 (6th Cir. 2004) and *Singfield v. Akron Metropolitan Housing Authority,* 389 F.3d 555, 566 (6th Cir. 2004) - argue that the just cause provisions of the CBA are

---

[6]As noted, the Plaintiffs argue that with the exception of Yvonne Malvaux and Yolanda Johnson, all of them were terminated before June 30, 2009. According to their pleadings, Johnson was terminated on August 7, 2009, and Malvaux was terminated two months later - on September 15, 2009. The remaining fifteen complainants were dismissed from their employment on various dates between June 30, 2006 and June 30, 2009.

sufficient to provide a property interest in their jobs.  After reviewing the record, the Court agrees. The undisputed language of the CBA provides in unequivocal terms that "[d]isciplinary action shall be imposed only for just cause." (Def's. Mot. for Summ. Jdgmt., Exh. 1 – CBA, Article 12, Section 1(A)). The case law is clear that such a contractual provision creates a property interest that is protected by the Fourteenth Amendment.  *Singfield, supra* at 566 (finding property interest in continued employment based on collective bargaining agreement between plaintiff and his employer that provided for termination only for just cause); *Jefferson v. Jefferson County Pub. Sch. Sys*., 360 F.3d 583, 587 (6th Cir.2004) (finding - pursuant to *Loudermill* - a collective bargaining agreement between teachers union and school board granted  plaintiff a property interest in continued pay and benefits because it provides that teacher may be suspended only for "just cause."). On the basis of this authority, the Court determines that those Plaintiffs, who were terminated before June 30, 2009,  possessed property interests in their positions with the 36th District which required the Defendants to provide due process to them.

Nevertheless, the Court believes that, even viewing the facts in a light most favorable to them, the law does not support the assertion by Malvaux and Johnson that they retained a property interest in their continued employment after the expiration of the CBA.  It is true - as the Defendants contend - that Michigan law relieves an employer of the duty to arbitrate violations of a just cause provision within a CBA after the contract has expired.[7] Yet, the Court agrees with the Plaintiffs that this is not the question presented here.  Rather, the Court is called upon to decide whether these two Plaintiffs, upon expiration of the CBA, maintained a property interest in their

---

[7]*See generally, Ottawa County v. Jaklinski,* 423 Mich. 1, 22, 25 (1985) (holding that the right to arbitrate grievances regarding violations of a CBA's just cause provision does not survive expiration of the CBA).

employment.   Property interests do not derive from federal law. Rather, their property interests are derived from state statutes, contracts, or some other mutual understanding between the citizen and a state agency.   Inasmuch as an expired CBA cannot - of itself - serve as a source of protected property rights,[8] the Court must look elsewhere.   Here, the Plaintiffs claim that their property interests are tied to the provisions of Michigan's Public Employment Relations Act ("PERA"), including Mich. Comp. Laws  § 423.215, which requires employers to (1) bargain with public employees in good faith on mandatory subjects of bargaining, (2) maintain the status quo and (3) not make unilateral changes regarding wages, hours, and other conditions of employment before reaching a bargaining impasse.  *See generally, Gibraltar School Dist. v. Gibraltar MESPA-Transportation,* 443 Mich. 326, 336 (1993); *Detroit Police Officers Ass'n v. Detroit,* 391 Mich. 44, 54-55 (1974).  The Plaintiffs correctly note that Michigan courts have recognized disciplinary procedures, including termination, as a mandatory subject of collective bargaining. *Pontiac Police Officers Ass'n. v. City of Pontiac*, 397 Mich. 674, 681-82 (1976) (noting that Michigan courts, like its federal counterparts, have adopted a broad view of this subject, and observing that under federal law "layoffs, [and] discharge," among other things, "are mandatory subjects of collective bargaining.").  Moreover, the parties agree here that they have not reached a bargaining impasse.  Yet, these factors are not dispositive of the controlling question. To the contrary, a close review of the law reveals that the Plaintiffs did not retain a property interest in their employment based on the cited provisions of the Michigan law.  Mich. Comp. Laws § 423.215 simply reveals a process,

---

[8]The Sixth-Circuit has previously held that, in those instances in which the terms of a CBA have expired, a plaintiff cannot rely upon it as a source of a protected property right in bringing a due process claim. *Ash v. Board of Educ. of Woodhaven School Dist.*, 699 F.2d 822, 827 (6th Cir. 1983).

through which public employers in Michigan are bound to bargain collectively with their employees according to a set of fair procedures. To this end, it requires negotiations to be conducted in good faith, at reasonable meeting times, and in a way that covers the terms and conditions of employment. It does not, however, require an employer or its workers to reach any sort of an agreement, and it most certainly does not place any sort of substantive limitation on a public employer's right to take adverse employment actions. In this regard, the Court does not find that the statutes give rise to a legitimate expectation of a property interest by the Plaintiffs in their continued employment. *Accord*, *Lake Michigan College Federation of Teachers v. Lake Michigan Community College et al*, 518 F.2d 1091, 1095 (6th Cir. 1975) ("the PERA contains no comprehensive catalogue of the substantive grounds for discharge, and it gives no assurances, conditional or otherwise, of continued public employment . . . We are convinced that this statute does not give rise to a protected property interest in continued employment."). Here, it appears that the Plaintiffs have confused the closely-related, but distinct, notions of procedure and substance. However, "[a] guarantee of procedural fairness does not establish a property interest." *Hayward v. Henderson,* 623 F.2d 596, 597 (9th Cir. 1980). In summary, the procedural protections of PERA alone (and case-law interpretations thereof) do not give rise to a protected property interest, and the claims of Malvaux and Johnson must, and are, be denied.

### *(2) Have the Plaintiffs Established that They Were Denied Due Process?*

Having determined that a limited grouping of Plaintiffs held a property interest in their employment that was protected by due process, the Court must now determine precisely what process they were due and whether the facts, if true, establish that they were denied those rights. As public employees with a constitutionally protected property interest in a continued employment,

federal law requires that prior to being discharged, the Plaintiffs be given (1) oral or written notice of the charges against them, (2) an explanation of the employer's evidence against them, and (3) an opportunity to present their side of the story on the contested issues. *Molina-Crespo v. U.S. Merit Systems Protection Bd.*, 547 F.3d 651, 661 (6th Cir. 2008) ("the essential requirements of due process . . . are notice and an opportunity to respond . . . [and] to present reasons, in person or in writing, why proposed action should not be taken.") (modifications in original) (citing *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542, 545-46 (1985) (noting that due process is met "by a pretermination opportunity to respond, coupled with post-termination administrative procedures," and opining that while a pretermination hearing need not be elaborate, "the root requirement of the Due Process Clause [is] that an individual be given an opportunity for a hearing before he is deprived of any significant property interest."); *See also, Farhat, supra* at 595-96 ("Where there is a system of post-termination procedures available to the employee that includes a neutral decision maker and/or arbitration, coupled with a pretermination "right of reply" hearing, then the employee has received all the process due under the Constitution. . . ."). The *Farhat* court also emphasized that due process merely requires an employer to afford a worker an opportunity for a post-deprivation hearing before a neutral decision maker. This means, in effect, that an employee who fails or refuses to participate in such a process cannot complain of a due process violation. 370 F.3d at 596.

To resist the Defendants' request for qualified immunity, the Plaintiffs must show that they were (1) not provided with a hearing or an opportunity to respond to the charges against them as required by *Loudermill, supra*, and (2) denied a post-termination hearing. *Farhat, supra; see also, Duchenne v. Williams,* 849 F.2d 1004, 1006-07 (6th Cir. 1988) (A "full post-termination, adversary,

14

trial-type hearing will serve to ferret out bias, pretext, deception and corruption by the employer in discharging the employee."). Here, the Defendants have presented affidavits and documentary evidence which show that each of the Plaintiffs were provided with fairly substantial pre-termination procedures, including (1) pre-termination meetings, (2) meetings where the termination decision was made, and (3) in all but four cases, the submission of the Plaintiffs' grievances through Step 4 of the CBA. The Plaintiffs, while not appearing to dispute this evidence, have focused their attention on the Defendants' failure to provide them with any post-termination due process procedures.

In response to this argument, the Defendants concede that they did not provide the Plaintiffs with any post-termination procedures. However, it is their position that they had no duty to do so in light of their belief that the CBA had expired. As to those Plaintiffs (Rodgers, Knight, Rice, Tate-Anderson, Flowers, Sharpley, Cooper, Jenkins, Stevens, Moss and Hill) who demanded arbitration, the Court finds that - if proven - the Defendants' failure to provide any sort of post-termination due process suggests an actionable violation of a constitutional right. *Farhat, supra; Duchenne, supra; Loudermill, supra.* In the judgment of this Court, the Defendants' duty to provide post-termination procedures exists independent of any duty that they may or may not have had under the terms of the CBA.

As to two of the Plaintiffs (Allen-Cruce and Carter) who allegedly failed to initiate or pursue an arbitration demand, the Court finds that, when viewing the facts in a light most favorable to them, there is sufficient evidence to suggest that they were denied their right to post-termination hearing rights. As to Allen-Cruce, the evidence proffered by the Defendants suggests that (1) she demanded arbitration on August 4, 2008, and (2) her request was rejected by them on the same day.

(Def's. Mot. for Summ. Jdgmt. Exh. 3, Tab 11).  Presumably, after receiving the ruling from a state court that was adverse to the Defendants' interests, she attempted to schedule an arbitration hearing in November of 2009.  However, it appears that her request was withdrawn by the Union nearly eight months later "without prejudice" in July of 2010. The Plaintiffs, by way of affidavit, now contend that they pursued this course of action because of the Defendants' failure to cooperate in arbitrating the grievances.  These facts, if proven, would permit an inference by a jury that the conduct by the Defendants had the practical effect of denying Allen-Cruce of her post-termination rights to due process.  An identical analysis also applies to Carter, who (1) demanded arbitration on January 13, 2009, (2) had his request rejected three days later, and (3) withdrew his request without prejudice more than one year later when the requested arbitration hearing was not scheduled.  Although the underlying facts are disputed by the Defendants, the Court believes that the Plaintiffs have established a prima facie violation of their rights, especially when the evidence is viewed in a light most favorable to them.

However, the claims by Malvaux and Cleveland must be rejected.  In Malvaux's case, she submitted evidence that the Defendants had denied her request to arbitrate preemptively.  As to Cleveland, she argued that the Defendants had denied her access to any part of the grievance process based on their view that the CBA had expired.  Although these facts present a close question, the Court does not believe their claim of "futility" is a sufficient basis upon which to revive the Plaintiffs' claims.  *See generally, Winskowski v. City of Stephen,* 442 F.3d 1107, 1111 (8th Cir. 2006) ("Nothing in our jurisprudence suggests that a government employee can legitimately sue for deprivation of the right to a post-termination hearing where he never asserted the right before suing for damages. . . .[Moreover] an employee who fails to request

post-termination process cannot later sue for having been deprived of it."); *Accord, Farhat, supra* at 597 (finding waiver of post-deprivation due process rights where plaintiff has failed to pursue further arbitration proceedings).

Finally, the Court rejects the Defendants' argument that the Plaintiffs had a duty to plead and prove an exhaustion of state remedies before bringing their claims. It is not always true that a failure to exhaust available state administrative or judicial remedies is detrimental to a § 1983 procedural due process claim based on employment contract rights. Although the Defendants cite to Sixth Circuit precedent which suggests that such a requirement exists, they have failed to acknowledge clear authority which demonstrates the limited application of this standard. Specifically, in *Mitchell v. Fankhauser*, 375 F.3d 477, 482 (6th Cir. 2004), the Sixth Circuit re-emphasized that there is a "significant distinction," as recognized by the Supreme Court and the Sixth Circuit, between (1) cases that involve due process deprivation claims "arising out of the alleged misconduct of state officers" and (2) those claims that arise because of challenges to established state procedures which, in and of themselves, may be lacking in due process. The *Mitchell* court concluded - after an exhaustive analysis of inconsistent precedent - that the duty in the Sixth Circuit to plead and prove the inadequacy of post-termination state-law remedies is inapplicable to the latter class of cases. *Id.* at 483-84 ("In the present case, [the Plaintiff] was not deprived of his property interest in his job pursuant to a random or unauthorized act. [He] therefore 'was required neither to plead nor prove the inadequacy of post-termination state-law remedies in order to prevail.'"). Here, the Plaintiffs do not allege due process deprivations based on random, unauthorized acts of state officers. Rather - as the Court perceives it - the Plaintiffs are attempting to challenge the adequacy of established state procedures which do not require arbitration or neutral

17

hearings after the expiration of a collective bargaining agreement. Under such circumstances, there is no need for the Plaintiffs to plead or prove the inadequacy of post-termination state law remedies in order to pursue their claims. *Id.* Accordingly, the Court rejects the Defendants' attempt to defeat the Plaintiffs' motion on this basis.

In summary, given the permissible inferences, which have been outlined above, that the Plaintiffs did not receive any due process before being terminated, it is clear that their claims survive the first prong of the qualified immunity analysis (namely, an alleged violation of a constitutionally protected right).

### B.

Next, the Court must determine whether the right to due process was "clearly established" at the time of the alleged deprivation. In undertaking this task, the Court looks "first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth Circuit], and finally to decisions of other circuits." *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir.1991). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

In this regard, the Defendants argue that the chief judge of the 36th District Court is entitled to qualified immunity because she "reasonably and objectively believed that the parties' agreement to arbitrate ceased when the CBA expired and was terminated in June 2006." (Def's. Mot. for Summ. Jdgmt. at 16-17). However and contrary to the Defendants' arguments, her subjective beliefs are not the focus, inasmuch as this Court is called upon to evaluate the complained-of conduct under the reasonableness standards as set forth in *Anderson*.

18

The above-cited *Loudermill, Farhat,* and *Singfield* cases collectively provide evidence that the right to procedural due process for public employees has been "clearly established" and one about which a reasonable official in her position would have had fair notice. The Court reaches this conclusion notwithstanding any belief by her that the CBA had been terminated. In the judgment of the Court, the Defendants' analysis focuses too narrowly upon whether there was a duty to arbitrate, when the relevant question from a due process standpoint should be whether, as a an official representative of a public employer, she had a duty to understand that the termination of an employee's position without any sort of post-deprivation process was impermissible even in the absence of the operation of a CBA. The Court finds that in light of the cases which have been outlined above, the answer to that question must be resolved in favor of the Plaintiffs. Thus, the Court concludes that Chief Judge Atkins is not entitled to qualified immunity with respect to the Plaintiffs' § 1983 due process claims. To the extent that she claims to have a lack of any personal involvement with the decision to fire the Plaintiffs, the Court finds that there is a genuine issue of a material fact on this issue because it is her contention that all of those administrative duties which pertained to labor relations and human resources matters had been delegated to James Meadows, Deputy Director of Human Resources. Thus, in her opinion, she (1) did not have any role in the investigation of the Plaintiffs' alleged misconduct and (2) was without any knowledge of the Plaintiffs' claimed property rights. However, the Plaintiffs' emails seemingly dispute this contention by suggesting that she had actual knowledge of the applicable grievance procedures as well as the underlying nature of their alleged wrongdoing. Moreover, the documentation from Meadows also suggests that - contrary to the representations by the Chief Judge - he was without authority to make any decisions on critical issues, leaving him with only the right to make

19

recommendations to his superiors within the court hierarchy.   Inasmuch as the facts do not establish the Defendants' right to a summary judgment on this issue as a matter of law, their attempt to dispose of the Plaintiffs' claims on this basis must fail.

V.

The Plaintiffs have filed a cross-motion for a summary judgment on their claim that the Defendants denied them of due process.  In light of the finding by the Court that the Defendants are entitled to immunity under the Eleventh Amendment, the only surviving portion of this lawsuit rests with the Plaintiffs' claims against the chief judge.  While the Court believes that this Defendant is not entitled to a finding of qualified immunity, the Plaintiffs have not established that the facts here are so one-sided in their favor that they are entitled to a judgment on their due process claims against her as a matter of law.

To the contrary, there is conflicting evidence in the record as to (1) whether a reasonable jury could infer that these processes were sufficient to provide the Plaintiffs with due process, (2) whether in certain instances - especially as to those which are related to Allen-Cruce and Carter - there was a withdrawal from or an abandonment of the arbitration proceedings by the Union, and (3) even assuming that the Plaintiffs can prove a constitutional violation, whether they would have still been terminated for wrongdoing, thereby eliminating the causal connection between their constitutional violation claim and the scope of their compensatory damages under *Carey v. Piphus,* 435 U.S. 247 (1978).  Because the Plaintiffs have not established that they are entitled to prevail on these claims as a matter of law, their motion for the entry of a summary judgment must be, and is, denied.

VI.

20

Therefore, and for the foregoing reasons, the Defendants' motion for a summary judgment (Docket Entry No. 11) is denied in part and granted in part.  The Defendants' request to dismiss the action against 36th District in its entirety, and against Chief Judge Atkins in her official capacity on grounds of Eleventh Amendment immunity is granted.  However, the Defendants' request to dismiss the lawsuit against Chief Judge Atkins in her individual capacity on the basis of qualified immunity must be, and is, denied, except with regard to Malvaux, Johnson, and Cleveland, as to whom the motion is granted.  The Plaintiffs' request for the entry of a summary judgment (Docket Entry No. 10) is denied in its entirety, as is the Plaintiffs' motion to strike the Defendants' supplemental reply (Docket Entry No. 19).


        IT IS SO ORDERED.


Dated:  August 24, 2011                          s/Julian Abele Cook, Jr.
        Detroit, Michigan                        JULIAN ABELE COOK, JR.
                                                 United States District Judge


**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on August 24, 2011


                                    s/ Kay Doaks
                                    Case Manager


21